Good morning. Our next case is North Star Innovations, Inc. v. Hirshfeld, Case No. 20-1874. Mr. Flynn, you have reserved five minutes for rebuttal. Is that correct? Yes, it is. Okay. You may proceed. Thank you. Good morning, Your Honors. This appeal involves three claim construction issues, two claim terms from Claim 1 and one claim term from Claim 2. We respectfully submit that the Board erroneously construed these claim terms and that when they are properly construed, there is really no dispute that the term prior art reference fails to disclose the limitations of these claims. I'd like to start with the limitation in Claim 1 of a first capacitor whose second terminal is coupled for receiving a boost signal and a second terminal of a second capacitor that is coupled for receiving the boost signal. The plain meaning of this claim language, as confirmed by the specification under Phillips, is that the second terminals of these capacitors must be connected in such a manner that the boost signal is actually received at those terminals. And in its claim construction portion of its final written decision, the Board actually construed this limitation in that way, requiring that the second terminal is connected in order to receive the boost signal. That was the Board's construction. But then later in its final written decision when discussing the churn reference, it appeared to construe connected in order to receive to require only that the terminals of the capacitors meet. So, Counselor, this is Judge Arena. What is it in the references? What's the language that you can point me to that would demonstrate defining opposite as inverted rather than just something, an example of an inverted signal? Judge Arena, I actually started with a different claim term. The opposite signal I was reserving for later. I'm actually on the claim limitation that requires the second terminals of the capacitors to be coupled for receiving the boost signal. Okay. That's fine. This particular issue is important for me, so just be sure you get back to it. Okay. Great. In any event, back to the limitation of the terminals, the second terminals being coupled for receiving. As I indicated, the Board actually construed that term to say that the terminals were connected in order to receive the boost signal. But then later in the decision discussing churn, the Board construed the term or seemed to construe the term to be connected in order or to be coupled to intervening circuitry that creates new signals that are in some way derived from the boost signal. There's no requirement under the proper claim construction that the boost signal be applied directly to the second terminals of the first and second capacitors. The claim does allow the boost signal to be applied to other terminals of intervening circuitry on its way to the second terminals of the capacitors. But the boost signal, as long as it passes through that intervening circuitry and reaches the second terminals of the capacitors, that's okay. But in this case, it is an incorrect construction to say that the intervening circuitry creates new signals such that the terminals of the second capacitors receive those entirely new signals rather than the boost signal itself, then the claim limitation is not met. That would essentially transform the claim language to recite the terminals of the capacitors be coupled to the boost signal, but not coupled for receiving the boost signal and not in accordance with the way the Board originally construed that claim term. When the patentee intended to require only that a terminal be coupled to another terminal, he said so very clearly in the same element of the claim. With respect to the first terminal of each of the first and second capacitors, the claim recites that it needs to be coupled to the output terminal. But with respect to the second terminal of each of those capacitors, the claim explicitly recites that it has to be coupled for receiving the boost signal. Does it always have to be coupled? Whenever it is coupled, yes, it always needs to be coupled for receiving the boost signal. Where in the specification do you find support for that? That is the entire description of the operation of the 875 circuit. The second terminals of the capacitors must always be receiving the boost signal in order for the double complementary pumping circuit to work in the way it's described. While one side of the circuit is charging, the other side of the circuit is boosting. And if the second terminals of the capacitors were not always coupled for receiving, not always receiving the boost signal, it would not operate in the way that it's described. It's the entirety of the specification that describes the operations, that makes clear that those second terminals must always be receiving the boost signal. And again, that is consistent with the way the board initially at least construed that they had to be connected in order to receive the boost signal. Does a signal received always have to be in a non-inverted or an inverted version of the boost signal? The fact of the matter is, Judge Reina, that if the second terminal of each of those capacitors is receiving the boost signal, then it's always going to be either inverted or non-inverted. It doesn't matter that the word inverted or non-inverted is in the claim. The way that the circuit is described in the specification, that's what's happening. In order for one side of the circuit to be charging and the other side to be boosting at the same time, the boost signal that's received by each side of the circuit has to be inverted from the boost signal that's received at the other side of the circuit. Otherwise, you wouldn't be able to have the circuit, one side of the circuit charging while the other side of the circuit is boosting and vice versa at all times. So, if it is properly construed to require that the second terminals of the capacitors must actually receive the boost signal, then really that's the end of the story because there's no dispute that the capacitors in the churn reference do not receive the boost signal. Excuse me, counsel. This is Judge Stoll. I understand your argument and I appreciate the argument you've just made. I'm wondering if you could now maybe address Judge Reyna's question before as I had a question about opposite and what support you had for what the specification says, for example. I missed the last part of your question, Judge Stoll. I just want you to address Judge Reyna's question about the meaning of the word opposite. All right. So, with respect to the claim language opposite, we submit that that plain and ordinary language means inverted. And the support in the specification is, again, the entirety of the specification that describes the operation of the circuit. What about the language at column one, it's around lines 33 through 34, that say, describe the signal as the non-overlapping clock signals C1 and C2, which are 180 degrees out of phase with each other. That's the exact language, I believe, that your adversary submitted their proposed claim construction. And it comes right from the specification. So, why isn't that sufficient? I mean, people don't usually think opposite necessarily means inverted. And if you meant inverted, then presumably you would have used that word in the claim. The language that you're pointing to in the specification, the non-overlapping and shifted 180 degrees out of phase with respect to each other, inverted signals are non-overlapping and shifted 180 degrees out of phase. But that language by itself in the specification is broader than the language in the claim of opposite 2. So, opposite 2 is a subset of non-overlapping signals shifted 180 degrees out of phase. But opposite 2, in fact, the references that we submitted, the extrinsic references that we submitted that were never used, indicate that it is properly understood that when the term is used opposite 2, signals that are opposite to each other, they are indeed inverted. So, it's not... I think there were like... You relied on some extrinsic references for the meaning of opposite. And I believe that there were other extrinsic... I believe Kingston had other prior references that provided meaning of the word opposite. What do we do in a situation like that, where the board is confronted with different extrinsic evidence? It's extrinsic evidence because it's prior patents, other articles about the meaning of a term, and they credit some and they don't credit others. Or they say, you know, we're crediting all of them, and we're going to take the broadest meaning, which encompasses, you know, both opposite meaning inverted and opposite meaning out of phase with one another. What sort of deference do we give that? Isn't that a fact-finding and we have to review it for substantial evidence? Judge Stoll, the references that Kingston submitted, in fact, were not references that were directed to opposite phase signal. The references that they submitted referred to the language from the specification, signals that were non-overlapping and shifted 180 degrees out of phase. And the references that they submitted indicated that when that language alone is used, it can be inverted, but it doesn't have to be inverted. Can I ask you something? I feel like you're not answering my question, because my question was, do I review this determination for substantial evidence? Well, I'm sorry. I am trying to answer your question. Answer my question first, and then you can tell me about what you think the references teach. So the question first is, do I review the board's finding with regard to what these references teach, with regard to the meaning of the word? Do I review it for substantial evidence under Supreme Court precedent that says claim construction can have underlying fact-finding? Yes, you do review those findings under the substantial evidence factor. But those references do go to the proper claim interpretation. And the point that I was attempting to make was that, in this case, I understand your question to be that if the board has to review conflicting references, then does not the substantial evidence standard apply to their review of those references? And I agree, it does. But what I'm suggesting is that, in fact, the references that were submitted by the parties here were not conflicting references. We were the only ones who submitted references that used the words, used the language, signals that were opposite to, that used opposite. The references that Kingston submitted never used the word opposite. They only used the broader language of the specification. You're referring to the references Higashisho, Pasternak, and Immig, correct? Is that what you're talking about? The references that we submitted to show that they were referring to opposite? Are those the references I just named? Yes, I believe so, Your Honor. Well, what is it in those references that has the effect of defining opposite as inverted? I mean, I see that the references disclose inverted signals and opposite signals, but I don't see the limitation of why we should limit the claims the way you want us to. The references do describe signals that, when they refer to opposite signals, they do describe that those signals are inverted. The references have examples of inverted signals. Yes, they do. My point about submitting those references was to show what was commonly understood by signals that were referred to as opposite signals. And so when those examples were used or submitted in those references, when that language was used, the signals there that were pointed out in the references were inverted. There were no non-inverted signals that were used in those references that specifically referred to signals that were opposite. And, in fact, that's, again, if you look at the specification, I think to go to the rest of Judge Stoll's question, if you look at the specification for further support, it is, again, the description of the operation of the circuit. The operation of the circuit, it can only work in the way that it's described throughout the specification if these signals are inverted.  One side pumping, boosting, while the other side is charging at all times. Mr. Flint, this is Judge Stoll again. I was looking at SOGEMA, which is the reference that was relied on or pointed to by Kingston and that the board relied on. That's the extrinsic evidence. And you earlier said that it doesn't use the word opposite, but it does. For example, at column two, lines 63 through 66, it talks about how these clock signals correspond to each other and are supplied as clock signals opposite each other in phase. And it uses the words opposite each other in phase. And if you look at those signals, they are opposite in phase, but they're not inverted. The board talked about that at length, so I'm wondering why you told me that SOGEMA does not use the word opposite, because that is the word we're construing, right? Your Honor, if I may clarify, what I was referring to when I said that the references submitted by Kingston did not refer to opposite, they were the extrinsic references that Kingston had submitted. Kingston never relied on the SOGEMA reference. The SOGEMA reference was introduced by the board at hearing. But it is extrinsic evidence, right? Yes, all I'm saying is that Kingston wasn't the one that submitted that, and the references that Kingston submitted, they were the references that I was referring to when I said that those references don't refer or use the word opposite. Okay, but the reference that the board actually relied on in reaching its conclusion, SOGEMA does. Yes, so it uses the word opposite, but what it refers to are signals that are opposite in phases. There is a difference. In fact, one of the board members at the hearing acknowledged that there was a difference between signals that are opposite to each other and signals that operate in opposite phases of the circuit. So in the SOGEMA, those signals were in opposite phases of the circuit, but they were not opposite to each other. And so what we tried to point out in our briefs when we delved further into the SOGEMA, the reliance by the board on SOGEMA, was that the SOGEMA reference was only used by the examiner to disclose the limitation of the originally filed Claim 1 of the H-75 patent, which disclosed non-overlapping and antiphase signals. Antiphase is the same thing as shifted 180 degrees out of phase. So it used SOGEMA to disclose that limitation of the originally filed Claim 1. But there were two other claims, 19 and 22, that used the same words that are used in issued Claim 1, signals that are opposite to each other. And for those claims, the examiner did not rely on SOGEMA. The examiner looked to another reference, the Young reference, that actually disclosed signals that were inverted. So for one of the claims, the signals that were inverted, disclosed by the Young reference, was enough to anticipate one of those claims. But for the other claim, the originally filed 19, which ultimately became issued Claim 1, there were other limitations that the Young reference did not meet. So the point is that when the examiner wanted to... Counselor, can you start concluding, please? Yes. So that's the explanation of SOGEMA, that it really was not used to disclose or to invalidate claims that required signals that were opposite to each other. I really had wanted to get into my argument on the inverting and non-inverting buffer. I believe I am over my time. Do I have permission to at least... Yes, you're over your time. In fact, I think that we ate up your rebuttal time. I'm going to restore rebuttal time, and I'll give you a minute to answer this to address this other issue you're talking about. Okay. Thank you. I appreciate that. So the other claim term is from Claim 2, and it is the claim limitation of inverting and non-inverting buffer. And, again, the plain meaning of these claims, as supported by the specification and as further supported by standard dictionary definitions, is that these are circuits that have single inputs and single outputs. In the case of an inverting buffer, the output is always inverted from the input. In the case of the non-inverting buffer, the output is always non-inverted from the input. Kingston had never proposed a construction for either of those terms. Kingston had only proposed a construction for buffer and proposed a construction that it isolates or decouples the output from the input. And under that construction, that's broad enough that, indeed, a buffer can include multiple inputs and multiple outputs. But the claim terms are inverting buffer and non-inverting buffer. They are specific kinds of buffers. And the specification and the extrinsic dictionary definitions that we submitted indicate that inverting buffers and non-inverting buffers, they are single inputs and single outputs. So, for example, the specification for the inverting buffer uses the electrical symbol of a NOT gate. And the technical dictionary definitions that we submitted show that a NOT gate is the same thing as an inverter and that an inverter is referred to as an inverting buffer. For the non-inverting buffer, the specification used the symbol of a buffer gate and the same kind of thing in the references that we submitted. It's commonly understood that a buffer gate is a single input, single output. So all of the devices that were disclosed in the references that we submitted, all of those devices, while some of them used AND gates and NAND gates and NOR gates that had multiple inputs, all the inputs were always tied together so that it resulted in a single input and a single output device. Okay. I think we've got that argument. Do my colleagues have any other questions? No. Okay. Thank you, John. Thank you, sir. Yes. Mr. Flynn, you have five minutes to rebuttal, but we kind of went over. You have the five minutes if you need it, okay? Thank you, sir. Yes. You may proceed. Hi. This is William LaMarca for the PTO. Hopefully you can hear me clearly. May it please the Court, in response to that opening argument, I'll start with the opposite equals inverted argument. As we point out in our brief, Your Honors, nowhere in the claim is the word inverted mentioned. Nowhere in the written description is the word opposite mentioned or defined. All that's in the specification, I think Judge Stoll referenced it, is Column 1, Lines 30 to 35, where it defines how the phased relationship works to a pair of non-overlapping clock signals, which are 180 degrees out of phase to one another. So really that's what's defining how the claim operates. And it's true that the word opposite is in the claim, but opposite can be opposite phases. It doesn't have to be inverted. So I don't think the Board or the agency disputes that inverted can be an opposite signal. It's just saying it's not limited to that. I think that's the position of the agency and that's the position of the Board. That was also the position of the petitioner and the petitioner's expert, which basically the Board agreed with. So I think that's the crux of the argument. Now, you know, the agency's view is the intrinsic evidence is the first thing to look at and the most important, which is the language of the claim. And the language of the claim doesn't include the word inverted, which it could have. They could have said inverted instead of opposite, but they chose not to. Number two, they read the context of that claim, they read it in the context of the specification, and I just read what Judge Stoll had referenced, but the specification doesn't say opposite equals inverted. It doesn't mention inverted. It doesn't mention opposite. All it says is non-overlapping clock signals that are 180 degrees out of phase. Well, CHIRN, the prior art, indeed, there's no dispute. It discloses non-overlapping clock signals that are 180 degrees out of phase. Now, they're not inverted. They're not inverted in mirror images with each other, but they are opposite of each other or they're opposite in phase. They operate in opposition to each other. So we think the agency believed that not only did the agency, the Board construe the claim correctly because they based it on the language of the claim in the context of the written description, but in addition, when you read the claim in the correct way, there's no dispute that substantial evidence in the record shows that CHIRN anticipates that claim phrase. Now, the only other point that was brought up by appellant is what about the extrinsic evidence? When you go back beyond the language of the claim and beyond the written description, which we don't think you even have to, but if you do, you look at these other references, and indeed, North Star's counsel brought forth evidence of references that show inverted signals that are opposite, and no one disputes that, that an inverted signal is opposite. However, the Board did cite to other references that show non-inverted signals, like the phylogema reference, that are also described as opposite. Furthermore, there were three other references, I believe, cited by petitioners that the Board referenced. One is called Perez, one is called Lamb, and one is called Song, and they were all examples of non-overlapping 180 degrees phase-shifted signals, and they weren't inverted. So the point is it's well-known in the art, I think that's the whole point, is it was well-known in the art to have non-overlapping signals in a charge-pumped circuit, which is what these are. The whole purpose of this circuit is to take a singular voltage and then pump that voltage up higher than the input and get a higher output with a single voltage source. That's the idea. And they use capacitors to help store charges that are alternatively back-and-forth charged, and then you use the benefit of that stored charge to help boost the voltage. Well, CHIRN does exactly that. Now, it may not do it. Mr. LaMarca, this is Judge Stoll. I was just curious as to your answer to the question I asked in the opening, which was what sort of standard of review do we apply when we're looking at the board's interpretation of that extrinsic evidence, including SOGMA? Well, we agree, Your Honor, that claim construction is a question of law, but as you pointed out, the Tebbe case at the Supreme Court made clear that it is possible to have underlying fact findings to help resolve that claim construction. However, that's kind of rare. And here, what we do have is extrinsic evidence that the board looked at as part of their overall evaluation of the claim. It really wasn't competing testimony. It was essentially extrinsic evidence, but there were expert reports that gave commentary on that extrinsic evidence. So in a sense, I could see how there's an argument to be made that those were fact findings that underlie the claim construction. However, it's pretty rare that that happens. Typically, the court approaches claim construction as a question of law, and it re-evaluates what, in this case, what the agency did de novo. So it's a little bit like ultimately it's a question of law, and we could give deference to the board's interpretation of those references. It doesn't mean we'd give deference to the board's weighting of those references as compared to, like, intrinsic evidence or something like that, but just more how the references were read and understood. I think that's right, Your Honor. I think the way we see it is we recognize it's a question of law, that's de novo reviewed by the court, and the court has authority to re-evaluate that de novo, but there were these factual determinations that the board engaged in when it looked at these extrinsic evidence references. And to the extent that there would be any fact findings there, it would be how they looked at those and made findings with respect to those extrinsic. And in this particular case, the board did look at the SOA-GEMA reference, and the board did make findings about the SOA-GEMA reference, and I think that was brought up in the argument. So I think that's where we're at. But in general, claim construction is a legal question, and we recognize that. Okay, thank you. Now, back to SOA-GEMA, I believe, you know, just to go back to what... Remember, we're past the language of the claim now, we're past the written description, and we think that resolves it, but let's go ahead and just look at the SOA-GEMA reference, because Appellant, you know, brought it up, not only in their briefs, but also here in argument today. And...but if you look at SOA-GEMA, what you find out is, sure enough, SOA-GEMA expressly does say that it... Remember, they're not inverted signals, but they do call those clock pulses signals opposite of each other in phase. And on the next page, on page appendix 1123, they say, as a result of column 3, lines 4 and 5, another reference beyond the one that you pointed to, the first and second booster circuit sections operate in opposite phases to each other, and then further down... I mean, the point is, they describe those phase signals that are non-overlapping, and sure enough, they're not inverted, but they're non-overlapping, and they're 180 degrees out of phase, just like churn. They describe those as non...as opposite phase signals, is what they describe them as. And if you look at appendix page 1119, you will see a drawing called figure 3B, which I believe the board reprinted in the board decision, and they show figure F2 and F4, the clock signals, as non-overlapping, yet not inverted. So the point is, you can have non-overlapping phase-shifted signals that are opposite to each other, even though they're not inverted, and that's consistent, you know, with the interpretation of the board that evidence. Now, appellant brought up the prosecution history and the examiner's... Counselor, let me... Let me ask you... Yes, this is Judge Reina. Let me ask you a quick question. Northstar argues that churn doesn't meet the limitations because its clock signals involve dead time intervals, and this is when both gates are closed. Can you address that issue? Yeah. The whole... It's true. There are little intervals of dead time, which means there are periods of time, and I believe it's in their brief, and they've highlighted two little bands in green and red. And if you look at... If I can take you to that page out of the brief, I'll show you where that is. I think we may have even reprinted that in our brief, Your Honor, in colorized form. Look at page 33. I believe that may be it. Is that 33 of their brief? Yeah. Let's go there. And what they're talking about is these delay periods, and they call that dead time. Okay. So down at the bottom of page 33 of the appellant's brief, you see a green zone and a red zone, and those are called dead time zones. And what it means is signal 5-3 and signal 5-4, which are the first and second clock signals that are found in churn, sure enough, they are non-overlapping clock signals, and they are also shifted 180 degrees of each other. However, they're not inverted, and because they're not inverted, that reflects this dead time. And the dead time is where both signals have a low period, and they're in the low state at the same time for a short window. And then there's another short window, the red, where they're in the low state at the same time. All that means is if they're in the low state at the same time, no current would be flowing during that low state. Now, the expert and the part, both experts, as well as the parties agree that if you have two clock signals with their low state at the same time, that's not really a problem because that doesn't defeat the operation of the circuit. But if they're both high at the same time, that would be a problem. If they were both high at the same time, then you could have current flowing from two switches simultaneously. That could cause a short circuit. That would be a problem. Here, what's happening in churn is very common. Similar to many of the other extrinsic evidence references that were submitted, those two or three other ones that we talked about earlier, when you see non-overlapping signals that are 180 degrees shifted, but they're not overlapping, there's always going to be these little periods of dead times. And those little periods of dead times don't stop the operation of the circuit. They simply have small windows of time where there's no pumping taking place. Now, that's not really a problem because here, remember what's happening. There's a voltage source coming in. The pumping charges up a capacitor. And when one switch is open, you're benefiting from that extra charge in that capacitor, and then you're boosting the voltage, right? But then that capacitor on its own is naturally discharging anyhow. So the charge of that capacitor goes down. Meanwhile, the other capacitor is being charged up. You switch back to the other one, and then you get the boosted voltage from the other one. The only difference is, here in churn, it's true. You might not boost quite as much. You might boost a little less because of this dead time. But at the end of the day, you still end up with an output voltage which is greater than the input voltage, and that is all the claim requires. The claim doesn't require that the boosting has to occur all the time, which is one of the things Appellant argues. The claim simply requires that these components are there in a cooperative relationship where you have two switches, you have two capacitors, you have a boosting signal, and you're able to switch back and forth in a phased relationship to ultimately give you a higher output voltage than the input voltage. Nowhere in the claim does it have to be just as high as they say it has to be. Now, so that's kind of our answer to that question, Your Honor. Okay, yeah, that helps. No, that helps. Thank you. Mr. LaMarca, can I ask you about the non-inverting and inverting buffer construction and the board's reliance on the manual? I think it was called Marston. Right. Yeah, there was a manual that they referred to. They looked at a figure. There was a figure in there, and they said that Marston taught that you could use, I think it was as inverting buffers, and that it would have more than one input, but if you look at the figure that they were referring to, that Marston was referring to, the inputs were tied together, and it was a single input, single output. I was wondering if you had a response to that. Well, I think this is really not about the opposite equals inverted. This is really more about the other claimed feature, inverted buffer or non-inverting buffer, right? That's where we're getting at now. That's right. And I'm just, I'm not sure if I agree with the board's reliance on that manual to teach that you can use NAND and NOR gates as the inverting buffer element with the NAND and NOR gates having two inputs, but in the figure in the manual that shows that, just figure 3.15, those NAND and NOR gates are shown as having inputs together, so it would be single input, single output. Yeah, I think that, I think, let me try to find it here so I can respond directly. I think we actually addressed this in our brief, and let me take you to that section where we talk about this, because I provide citations there that might be helpful. And I apologize because it's a large record here, and I'm trying to get you to the point. I don't know if you can hear me, but the figure is at JA1902. 1902. Okay. Let's go there. Right. Okay, yeah, you see figure 3.15 and the language any NAND or NOR gate can be used as an inverting buffer element. I think that's what the board referenced. The language right there next to figure 3.15 quote, any NAND or NOR gate can be used as an inverting buffer element. And that was kind of the basis for their view. What about the fact that figure 3.15 actually shows that there's just single input, single output on all of those figures. Maybe I'm looking at the wrong figures, but I just see single input, single output. I think 3.15 is above, not below, right? Right. You're right, and you're right, it shows a single line going in and a single line going out. Right. Well, if you read also on the earlier section on the prior page, 1901, practical CMOS inverters are often called inverting buffers. If you have an application where you need only one or two connecting bare NAND and NOR gates in a way shown in figure 3.15, I think all they're doing in that figure is just saying, look, you can hook these things up, and you can use them as a tool to create an inverter or a non-inverting buffer. But this was relied on by the board to say specifically that it's not single input, single output, that this shows an example of single input, single output, but I don't see it because it says that you can, you know, come up with an inverting buffer, as you say, by using NAND or NOR gates, but in the way shown in figure 3.15. And when you look at figure 3.15, it's single input, single output, so I'm having trouble seeing this, reading this reference in the way that the board did. Yeah, I mean, the way we presented it in our brief, and I tried to interpret the board, and I can go to the board's decision, I think it's appendix page 24 of the board decision where they cite the, this reference that you're referring to right now. Yeah, here we go. Let's go right here if I can find it. What page are we on, 24? I'm on page, I'm on a page appendix 24 of the board decision. Are you talking about the sentence that says, moreover, extrinsic evidence of record, specifically a prior manual shows that inverting buffers have more than one input? There you go. I don't see where there's more than one input there, but okay. Remember, a NAND or NOR gate, by definition, AND means you're ANDing two things together, you're bringing two things together, and NOR means you're selecting, I think. I think, by definition, these are logic gates, they're not physical connections. It's the logic of a NAND or a NOR gate that they're talking about that can be used as an inverting buffer or a non-inverting buffer. Do you agree, though, that figure 3.15 shows a single input and a single output for the NAND and NOR gates? Well, I don't want to say for sure, but to me, figure 3.15 are logic symbols that go into your circuit diagram is what they are. That's what those are. If you see, they show blank or blank equals the thing on the right. It's like something or something else equals this. So, you have two options going in, and you have a output on the right. So, something or something equals something. Do you see that, Your Honor? I do, I do. I just don't think that the things that are, you know, I just think that all three of those are single input and single output. But I thank you for your answers to my question. Yeah, I think maybe another way to look at this is, even if you didn't look at those figures, the text of this manual does say, when you need only one or two inverters, you can usually get them by connecting SPARE, NAND, or NOR gates. But it does say, as shown in figure, it says, in the ways shown in figure 3.15. So, I don't think you can read that without reading the full sentence. Right. I understand. But at the end of the day, I think what the real argument is, is could, does the claim require a singular input that is always inverting or always not inverting, which is what the argument is being made by appellant. And I think the board's response is the claim is just not that narrow. I understand. If we have a circuit that gives you that result some of the time, and it's capable of doing it, even though it is capable of doing other things, it has more flexibility to be used in other ways, that doesn't mean it's not anticipatory of the claimed invention, Your Honor. So, I think the crux of the real argument here is, appellant's argument is they're trying to, again, narrow this claim beyond what it says. The claim doesn't say that it always has to be inverting or it always has to be non-inverting. Let's say it does it sometimes, and sometimes it doesn't, or there are other options that you can manipulate in the churn circuit, it would still qualify and still anticipate the prior art. Mr. LaMarca, I think I understand what you're saying, and this is a little bit different way of saying it also. You're saying that even if I didn't agree with the Board's interpretation of this extrinsic evidence, nonetheless, there's intrinsic evidence to support the Board's claim construction. Is that right? I think that's right, Your Honor, yes. Okay, thank you. Now, I hope I've answered all the questions, I hope I've addressed all the issues. Let's find out, Mr. LaMarca, do my colleagues have any other questions? There was only one final point, Your Honor, and I didn't get to mention about the examiner allowing Claim 19 that had the word office, and I did have a response to that if you wanted to hear it. Yes, go ahead. If you go to the examiner's office action from the original prosecution, which is what appellant was referring to, and you go to that page, appendix 494 of the Joint Appendix, it says in there, SOGIMA discloses Figure 3A, a circuit comprising a first booster and a second booster, the clock pulses applied are opposite each other in phases. So that confirms that SOGIMA, indeed, describes them as opposite. But now appellant came back and said, hey, wait a minute, Claim 19 and another one, Claim 22, Claim 19 was ultimately rewritten as Claim 1, and it included the word opposite. And he said, therefore, they changed the language, and therefore that made it different by putting the word opposite in the claim. However, if you look at the reasons for allowance, that's the part that we haven't looked at. At appendix page 509, allowable subject matter, the examiner says, Claims 19 through 21, which includes that Claim 19 that included the word opposite, these claims would be allowable because none of the prior reference discloses a booster circuit having a first and second switch coupled between input and output terminals and two capacitors. In other words, there were other features in the claim missing from SOGIMA, and therefore that's how that claim got allowed. It had nothing to do with the word opposite being put in there, if you read what's in the reasons for allowance. I would submit that the conclusions that appellant's trying to draw from this prosecution history doesn't really get them there. There were different reasons why that claim was allowed. That's my final point, Your Honor. Okay. We thank you, Mr. Romarco. Okay. Thank you very much. Yes. Counselor Flynn, we used up your rebuttal time, but I'm going to restore your five minutes to the extent that you need to use it, okay? Thank you. I appreciate that, Your Honor. I hope not to have to use it all, but thank you. I'd like to start, if I could, with the inverting and non-inverting buffer issue, and particularly the Marston issue. Judge Stoll, you are correct that figure 3.15 does show single input, single output devices because the inputs are tied together. We also, if you look at page 60 of our brief referring to figure 3.27, that figure 3.27 is captioned methods of using AND gates as simple buffers. This is a non-inverting buffer. The figure is above the caption. Again, what you see there are AND gates that have multiple inputs, but they're all tied together, and so they form a single input, and there is a single output. In fact, the Marston reference teaches if you look at appendix page 1904, the Marston reference specifically teaches that sometimes when you're using multiple input AND gates, you don't want to use all of the input terminals. It specifically says that in this case, the unwanted inputs can be disabled by either tying them high or by simply shorting them to a used input in the manner shown in figure 3.26, which is what I just directed you to. In that way, that the AND gates can be converted into non-inverting buffers by either tying all but one of their inputs high or by simply shorting all of their inputs together. That is expressly teaching that that's the way you use multiple input AND gates to make a single input, single output non-inverting buffer. The only other point I would make is that and again in what we pointed out in our brief, the board had pointed to what it thought was figure 3.27 to show a non-inverting buffer made of multiple input AND gates where the inputs weren't all tied together, but that was a mistake because they were pointing to what actually was figure 3.28, not 3.27. In fairness to the board, that's what Kingston had put in their papers and so the board relied on the same mistaken figure that Kingston was asserting, but the real figure 3.27 shows the inputs tied together. The other response I would have then about whether there's any evidence in the intrinsic record that would suggest that these inverting buffers and non-inverting buffers can be anything but single input, single output and the answer is no. There is nothing in the intrinsic record that would suggest anything other than single input, single output. Again, the board relied on the same mistaken figure 3.27.  mistaken figure 3.27. The board relied on the same mistaken figure 3.27. It just overcame those references by its mistaken reliance on the wrong figure 3.27. So I respectfully submit to you   would suggest that these non-inverting buffers and non-inverting buffers and non-inverting and inverting buffers are anything but single input, single output. If I can quickly move to the claim limitation about whether or not the signals are opposite phase signals and relying on the specification. If we are going to rely on the specification as we must under Phillips to describe the meaning or to inform the meaning of the claim term, the signals that are opposite to each other, you have to look at the entirety of the specification. So director, my colleague, points to the language in the specification that refers to non-overlapping and shifted 180 degrees out of phase. Again, opposite phase signals are included in that category. But what there's no mention of is figure 2A, which is also part of the specification. And as Kingston conceded that oral argument, figure 2A discloses those phase signals, C1 and C2, as being inverted signals. And the rest of the entirety of the specification that describes the operation of the circuit, that requires those signals to be inverted signals. I disagree with my colleague that there would be no adverse consequences if you had the dead time that would result from using churn signals. The adverse consequences is that it would not be boosting at all times, and that is specifically what the 875 patent specification indicates at column 3 lines 5 where it talks about that the capacitive device or capacitive device 48B is driving load at all times. That means it's boosting at all times. Thank you. That's all I have. Thank you very much. This case will now be taken under submission.